CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED
NOV 07 2006
JOHN F. CORCORAN, CLERK
BY:
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| JEFFREY WILLIAM KUYKENDALL, | ) | |
| | ) | |
| Plaintiff | ) | Civil Action No. 7:05cv00581 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| YOUNG LIFE, | ) | By: Samuel G. Wilson |
| Defendant. | ) | United States District Judge |

Plaintiff Jeffrey Kuykendall brings this personal injury action against Young Life, a charitable corporation that owns and operates the Rockbridge Alum Springs Young Life Camp in Rockbridge County, Virginia ("the Camp"), for personal injuries he received when he fell at a ropes course at the Camp while serving as a volunteer student leader there. The court has diversity jurisdiction pursuant to 28 U.S.C. § 1332.[1] Under Virginia's charitable immunity doctrine, Kuykendall bears the burden of proving gross or willful and wanton negligence. Young Life maintains that Kuykendall's evidence is insufficient as a matter of law, and has moved for summary judgment. The court agrees and grants Young Life's motion.

I.

Young Life, a charitable, tax-exempt, non-profit corporation, owns and operates the Camp in Rockbridge County, Virginia. The Camp includes a "ropes course"– an engineered, outdoor structure campers use for climbing and traversing, which consists of cables attached to trees some

---

[1] Kuykendall is a Florida citizen for diversity purposes, and Young Life is a Texas corporation with its principal place of business in Colorado. Kuykendall seeks damages in excess of $75,000. Accordingly, the court has diversity jurisdiction over the subject matter of the suit pursuant to 28 U.S.C. § 1332.

1

distance above the ground. Facilitators and student leaders lead and supervise campers along the course which is intended to be physically challenging and to promote leadership skills and teamwork. The user wears a harness, clips his harness to a safety cable above his head, and walks along a lower cable. The cables are permanently wrapped around each tree on the course and locked into place with clamps. Two different types of clamps are used in accomplishing this - a weight-bearing clamp that is designed to withstand a person's weight and which serves to keep the cable securely attached to the tree, and a non-weight-bearing clamp, or "sleeve," into which any excess length of cable runs. The sleeve, which is marked in red tape, is not intended to support weight, or to secure the excess cable length such that it, alone, will support a person's weight, but rather it serves merely to keep excess cable snugly in place next to the safety cable.

Young Life staffs its course with trained facilitators and other staff members, including volunteer leaders, such as Kuykendall. It gives facilitators between twenty-four to thirty hours of training, and they are, in turn, responsible for supervising other staff members and campers. Young Life also has various policies regarding the proper operation and supervision of the course for all course users, including a protocol for proper safety clipping instruction. Course users are instructed to clip between the red-taped sleeves in order to avoid clipping to a non-weight-bearing cable, and facilitators actually demonstrate where and how to clip properly. According to Young Life policies, supervisors are also supposed to ascertain the experience level of staff and to accompany them on the course to their respective supervision stations. In addition to these and other safety policies, Young Life has the course inspected annually by an independent ropes course expert, and the expert last inspected the ropes course less than two months before Kuykendall's accident.

On July 4, 2003, Kuykendall, who was then 20 years old, was at the Camp serving as a

2

volunteer leader responsible for supervising and assisting a group of high school students on the course. Kuykendall had been trained on and served as a supervisor on other Young Life courses, although it was his first time on this particular course. The course manager was not working that day, and a course facilitator was supervising the group and summer staff. Although the facilitator did not inquire as to Kuykendall's skill level before allowing Kuykendall to enter the course, he instructed the leaders and campers regarding proper techniques for clipping and for maneuvering the course.

Kuykendall entered the course and headed to his assigned position unaccompanied by a staff member, although a staff member watched him from the ground. Kuykendall was wearing a safety harness with attached safety clips, and when he reached the tree near his assigned position, he clipped to a separate, nearby cable to enable him to monitor without obstructing campers. He did not, however, clip to the correct side of the cable as marked by the red-taped sleeve. Instead, he clipped to the side that has both the weight-bearing cable and the excess, non-weight-bearing cable. Apparently, the excess length of cable had loosened from the red-taped sleeve. This left enough space between the two cables for Kuykendall to clip to one cable or the other, instead of clipping around both, which would have ensured that he clip to the weight-bearing cable. In fact, when Kuykendall clipped his harness, he clipped it to the non-weight-bearing cable rather than the proper weight-bearing cable. When he placed his weight on the harness and cable, the excess cable gave way, and Kuykendall fell nearly 35 feet to the ground. There is no evidence that Young Life's employees were aware that the excess cable had separated from the weight-bearing cable or that they actually recognized the risk.

3

Case 7:05-cv-00581-SGW-PMS   Document 85   Filed 11/07/06   Page 3 of 6   Pageid#: 1085

## II.

Kuykendall does not contest the application of Virginia's charitable immunity doctrine. Instead, he argues that the facts are sufficient to prove gross negligence – the heightened degree of negligence the doctrine requires except in cases of negligent hiring and retention: proof of "indifference to another and an utter disregard of prudence that amounts to a complete neglect for the safety of such other person," or a degree of negligence that would "shock fair-minded persons." Cowan v. Hospice Support Care, Inc., 603 S.E.2d 916, 918 (Va. 2004).[2] Essentially, Kuykendall contends that the evidence is sufficient for a reasonable jury to find that Young Life was simply indifferent to his safety. The court finds, however, in the light most favorable to Kuykendall, that the evidence, at best, would support a finding of simple negligence, or "the failure to use the degree of care that an ordinarily prudent person would exercise under similar circumstances to avoid injury to another." e.g. Cowan, 603 S.E.2d at 419. It would not support a finding that Young Life was indifferent or apathetic to Kuykendall's safety.

Kuykendall's accident is unfortunate and perhaps due to Young Life's negligence. The

---

[2]As the Virginia Supreme Court has made clear there are "fundamental distinctions" between simple, gross, and willful and wanton negligence:
> Acts or omissions of simple negligence may occur routinely in the performance of the activities of any charitable organization. Employees or volunteers, in carrying out their duties, may fail to understand or to adequately follow instructions of the supervisor, may exercise poor judgment, or may have a lapse in attention to an assigned task. While serious consequences may result from these deficiencies in performance, they ordinarily do not involve an extreme departure from the charity's routine actions in conducting its activities.

Cowan, 603 S.E.2d at 918. In contrast, gross negligence involves conduct that "shocks fair-minded people." Id. Willful and wanton negligence involves an even greater degree of negligence than gross negligence. It requires a showing that the defendant "act[ed] consciously in disregard of another person's rights or . . . with reckless indifference to the consequences, with the defendant aware, from his knowledge of existing circumstances and conditions, that his conduct probably would cause injury to another." Id. at 919.

4

evidence does not suggest, however, that it was due to Young Life's indifference or apathy. Young Life hired an expert who examined its course less than two months before Kuykendall fell. It gave its facilitators more than 24 hours of training. Only experienced, trained volunteers assisted the facilitator. Kuykendall had been trained on and served as a supervisor on other Young Life ropes courses. Finally, the course facilitator instructed the leaders and campers regarding proper techniques for clipping and for maneuvering the course.[3]

Kuykendall argues, however, that cumulative acts of negligence can amount to gross negligence, and he catalogs all the actions Young Life took or failed to take that hindsight judgment and an expert could suggest. Although the court agrees that cumulative acts of negligence can amount to gross negligence, they do so only if they support the conclusion that Young Life was indifferent or apathetic to Kuykendall's safety. See Ferguson v. Ferguson, 181 S.E.2d 648, 652 (Va. 1971) (holding that the effect of several negligent acts may constitute gross negligence not because of the number of acts, but because the cumulative acts constituted gross negligence). Proof of a series of actual or theoretical causes do not prove gross negligence, unless they support an inference of indifference to safety. They must prove "a degree of negligence that would shock a fair-minded person." Cowan, 603 S.E.2d at 618. Here, Kuykendall has proven nothing more than simple negligence.

Kuykendall's list of Young Life's failures that resulted in his accident, for the most part, fall

---

[3] Kuykendall also suggests that the court should impose strict liability because the operation of a ropes course is an ultra-hazardous activity. However, the hallmark of an ultra-hazardous activity is the "inability to eliminate the risk through the exercise of reasonable care." See generally, Phillip Morris, Inc. v. Emerson, 368 S.E.2d 268, 282 (Va. 1988) (citing Restatement (Second) of Torts § 502(c)(1965)). Here, the heart of Kuykendall's claim is the assertion that Young Life *could* have eliminated the risk to Kuykendall through the exercise of reasonable care.

5

Case 7:05-cv-00581-SGW-PMS   Document 85   Filed 11/07/06   Page 5 of 6   Pageid#: 1087

into four categories: failure to (1) recognize a design flaw in the course; (2) inspect the course; (3) properly instruct train and supervise its facilitators and staff; and (4) follow its own policies and protocol. Yet, when all is said and done the evidence is essentially this: Kuykendall, a volunteer, adult supervisor with previous ropes course experience, after having been instructed by a trained, ropes course facilitator, fell on an inspected course, when he clipped to the wrong side of a properly marked cable. Although if the court had before it a simple negligence standard it would submit the matter to a jury, Kuykendall must prove gross negligence. He must prove "indifference to another and an utter disregard of prudence that amounts to a complete neglect for [his safety]," a degree of negligence that would "shock fair-minded persons." See Cowan, 603 S.E.2d at 419. In that regard, this evidence fails to raise a triable issue of fact, and the court will grant Young Life's motion for summary judgment.[4]

### III.

For the foregoing reasons, the court grants Young Life's motion for summary judgment.

ENTER: November 7, 2006.

_____

UNITED STATES DISTRICT JUDGE

---

[4] Since Kuykendall cannot support his claim of gross negligence against Young Life, he also cannot prevail in his claim for willful or wanton negligence, which requires an even greater degree of negligence than gross negligence.

6